## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**AARON GARRETT, as the Wrongful Death**
**Personal Representative for the**
**Estate of Bernard Martinez, deceased,**

      Plaintiff**,**

**v.**                                    **No. _____**

**BOARD OF COUNTY COMMISSIONERS**
**OF THE COUNTY OF EDDY, NEW MEXICO,**

**SHERIFF MARK CAGE,**
individually and in his official capacity,

**WARDEN BILLY MASSINGILL**,
Individually and in his official capacity,

**LT. ROGER MAXWELL,**
individually and in his official capacity,

**DETENTION OFFICER DUSTIN SULLIVAN,**
individually and in his official capacity,

**DARLA BANNISTER, ACNP,**

**EMMA RENTSCHLER, R.N.,**
individually and in her official capacity,

**BRYAN RAYROUX, R.N.,**
individually and in his official capacity,

**RHONDA BRYANT, R.N.**
individually and in her official capacity, and

**SYLVIA J. MARIN, R.N.,**
individually and in her official capacity,

      Defendants.

## COMPLAINT FOR THE RECOVERY OF DAMAGES CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS AND TORTIOUS CONDUCT RESULTING IN THE WRONGFUL DEATH OF BERNARD MARTINEZ

COMES NOW Plaintiff Aaron Garrett, the duly appointed Wrongful Death Personal Representative of Bernard Martinez, Deceased, and by and through counsel, THE SPENCE LAW FIRM NM, LLC (G. Bryan Ulmer, Dennis K. Wallin, and Alisa C. Lauer), and for his Complaint states:

### JURISDICTION AND VENUE

1.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1367, and by 42 U.S.C. §§ 1983 and 1988.

2.      Plaintiff's claims arise out of events that occurred exclusively in Eddy County and the State of New Mexico, and within the United States District of New Mexico.

### PARTIES

3.      **Bernard Martinez** was a 33-year-old man who was an inmate in the custody, care, and control of the Eddy County Detention Center (or "ECDC") on April 20, 2019, which directly resulted in his death.

4.      While incarcerated, Bernard was completely dependent upon Defendants for his care and well-being.

5.      At all times pertinent hereto, Bernard Martinez was a resident of Eddy County, New Mexico.

6.      **Plaintiff Aaron Garrett** is the Wrongful Death Personal Representative of Bernard Martinez's Estate, who is duly appointed to serve in that capacity pursuant to laws of the State of New Mexico, and in such capacity, brings this action on behalf of all statutory beneficiaries of the Estate of Bernard Martinez and in accordance with Sections 41-2-1 through 41-2-3 NMSA.

7.      **Defendant Board of County Commissioners of the County of Eddy ("Eddy County")** is, and at all relevant times was a political subdivision of the State of New Mexico, and the duly elected and lawfully serving governing body of Eddy County, New Mexico, and acted through its employees and agents who operated and served at the ECDC.

8.      Defendant Eddy County is a "person" under 43 U.S.C. § 1983.

9.      At all times material to this Complaint, Eddy County was the employer or contractor of the individual Defendants.

10.     **Defendant Sheriff Mark Cage** was, at all material times to this lawsuit, employed as the Sheriff of Eddy County, in Eddy County, New Mexico, and was responsible for oversight and management of the ECDC.

11.     Defendant Sheriff Cage is sued in both his individual capacity and his official capacity as Sheriff of Eddy County. He was acting under the color of state law and within the scope of his employment at all material times.

12.     **Defendant Billy Massingill** is an individual, and was at all material times employed as the Warden of ECDC in Eddy County, New Mexico.

13.     Defendant Massingill himself also performed acts and omissions giving rise to this matter.

14.     Defendant Massingill is sued in both his individual capacity and his official capacity as Warden of ECDC. He was acting under color of state law and within the scope of his employment at all material times.

15.     **Defendant Lt. Roger Maxwell** is an individual who, at all material times, was an employee of Eddy County serving as a lieutenant detention officer at ECDC, in Eddy County, New Mexico, and who supervised the detention officers who performed acts giving rise to this matter and oversaw and participated in acts giving rise to this matter.

16.    Defendant Maxwell himself also performed acts and omissions giving rise to this matter.

17.    Defendant Lt. Maxwell is sued in his individual and official capacities. He was acting under color of state law and within the scope of his employment at all material times

18.    **Defendant Dustin Sullivan** is an individual who, at all material times, was an Eddy County employee serving as a detention officer at ECDC in Eddy County New Mexico, and who performed and participated in the acts giving rise to this matter.

19.    Defendant Sullivan is sued in his individual and official capacities. He was acting under color of state law and within the scope of his employment at all material times.

20.    **Defendant Darla Bannister, ACNP,** is an individual and was at all material times the Medical Director of ECDC acting under private contract with Eddy County and providing professional medical services as a Nurse Practitioner pursuant to New Mexico licensure.

21.    Defendant Bannister, at all material times, participated in the actions giving rise to this matter, or was the employer or supervisor of employees who participated in actions giving rise to this matter.

22.    Defendant Bannister was contractually responsible for the provision and oversight of health care at ECDC during the events material to this complaint.

23.    Defendant Bannister's contractual scope of work included providing onsite physicals, examinations, subsequent prescription of care, and referrals for hospitalization or other care. She was contractually obligated to abide by Eddy County Detention Center Policies and Procedures. She was ultimately responsible for all clinical decisions and actions concerning incarcerated individuals' health care needs, per the terms of her contract with Eddy County.

24.    Under the base terms of the contract with the County, Defendant Bannister was

compensated Ten Thousand dollars ($10,000) per month, plus applicable New Mexico gross receipts tax, which was increased to Eleven Thousand Twenty-Five Dollars ($11,025.00) per month, plus applicable New Mexico gross receipts tax for 2019-2020.

25.     Defendant Bannister is sued in her individual capacity.

26.     **Defendant Bryan Rayroux, R.N.,** is an individual and was at all material times a Registered Nurse providing medical services at ECDC pursuant to New Mexico licensure, either as an employee of ECDC or a private contractor, to provide professional medical services at ECDC.

27.     Defendant Rayroux is sued in his individual and official capacities. He was acting under color of state law and within the scope of his employment at all material times.

28.     **Defendant Emma Rentschler, R.N.,** is an individual and was at all material times a Registered Nurse providing medical services at ECDC pursuant to New Mexico licensure, either as an employee of ECDC or a private contractor, to provide professional medical services at ECDC.

29.     Defendant Rentschler is sued in her individual and official capacities. She was acting under color of state law and within the scope of her employment at all material times.

30.     **Defendant Rhonda Bryant, R.N.,** is an individual and was at all material times a Registered Nurse providing medical services at ECDC pursuant to New Mexico licensure, either as an employee of ECDC or a private contractor, to provide professional medical services at ECDC.

31.     Defendant Bryant is sued in her individual and official capacities. She was acting under color of state law and within the scope of her employment at all material times.

32.     **Defendant Sylvia Marin, R.N.,** is an individual and was at all material times a

Registered Nurse providing medical services at ECDC pursuant to New Mexico licensure, either as an employee of ECDC or a private contractor, to provide professional medical services at ECDC.

33.　　Defendant Marin is sued in her individual and official capacities. She was acting under color of state law and within the scope of her employment at all material times.

## FACTUAL BACKGROUND

34.　　Bernard Martinez was arrested on April 15, 2019, for the failure to report to specialty court for an intake evaluation on a misdemeanor charge.

35.　　Hospital records indicate he was taken to the hospital for medical clearance prior to incarceration.

36.　　Hospital records indicate Bernard reported using heroin two days before his arrest, methamphetamine the night before his arrest, and smoking a fentanyl pill the morning of his arrest.

37.　　Hospital records indicate that Bernard presented with a primary complaint of emotional or behavioral disorder or substance abuse and that he admitted to drug abuse.

38.　　Hospital records indicate that Bernard was experiencing the adverse effects of drugs, and gave differential diagnoses of intoxication and drug use.

39.　　Hospital records indicate that discharge instructions for Bernard's condition were given to ECDC.

40.　　The discharge instructions indicated Bernard's drug use and instructed to follow up with a physician in two to three days to recheck his condition.

41.　　Hospital records that Bernard was discharged to ECDC at 5:37 p.m., on April 15, 2019.

42.　　ECDC records show that Bernard was booked into the Eddy County Detention

Center shortly after he was discharged from the hospital on April 15, 2019.

43.    The ECDC Arresting/Intake Medical Clearance form asked: "Does the inmate act sick in any way?" to which the arresting officer and Joel Parraz, acting as the ECDC booking officer, both responded, "Yes."

44.    The ECDC Arresting/Intake Medical Clearance form instructs: "If any of the above questions were answered with a yes please be very careful in further investigating the problem to find if the inmate is appropriate for booking into this facility at this time."

45.    At 7:29 p.m., on April 15, 2019, an ECDC booking officer, Lannette Ruiz, began performing a Medical/Mental Health Screen on Bernard.

46.    Officer Ruiz indicated in the Health Screen that Bernard was under the influence of fentanyl and methamphetamine.

47.    Officer Ruiz indicated in the Health Screen that Bernard would be going through withdrawal while incarcerated.

48.    After being processed and booked, ECDC placed Bernard in unit 168 at 7:50 p.m. on April 15, 2019.

49.    At approximately 8:15 p.m., Defendant Rayroux performed the medical intake of Bernard.

50.    Defendant Rayroux instructed Bernard to "come up when nurses make rounds so he could be monitored during withdrawal."

51.    Defendant Rayroux violated ECDC policies requiring monitoring of inmates going through withdrawal or exhibiting symptoms of medical conditions.

52.    At the end of the intake by Defendant Rayroux, Bernard was moved into unit 178.

53.    There are no medical records or ECDC records indicating any monitoring of or

other medical attention given to Bernard on April 16, 2019.

54.    At approximately 1:20 a.m., on April 17, 2019, Bernard was vomiting violently.

55.    At approximately 7:30 a.m., on April 17, 2019, Bernard was still vomiting violently.

56.    At approximately 8:40 a.m., on April 17, 2019, Bernard was moved from unit 178 to unit 168.

57.    At approximately 12:30 p.m., on April 17, 2019, Bernard was seen by Defendant Rentschler in unit 168.

58.    The ECDC Medical Department form titled "SBAR", dated April 17, 2019, identified Defendant Rentschler as the nurse and Defendant Bannister as the physician, indicated the assessment as "OPIOID WITHDRAW."

59.    The assessment also indicated "(Or) I am not sure what the problem is but the patient is deteriorating, please advise."

60.    Under "Recommendation," Defendants Rentschler and Bannister requested Vistaril twice daily as needed for up to 5 days, Clonadine twice daily as needed when blood pressure was greater than 150/90 and pulse was greater than 100, Imodium twice daily as needed for 5 days, and Zofran twice daily as needed for five days.

61.    No action was taken to address Bernard's deteriorating condition.

62.    Despite Defendants Rentschler and Bannister's knowledge of Bernard's symptoms and serious medical condition, they failed to perform a physical exam on him; palpitate his abdomen; consult with a physician or supervisor; refer him for examination by physician or other qualified provider; ensure that he had proper treatment or that his condition was being properly monitored; or arrange for him to be transferred to a medical facility for proper examination and

treatment.

63.     Defendants Rentschler and Bannister violated ECDC's policies and procedures and their professional standards of care.

64.     Defendants Rentschler and Bannister's actions and omissions were more than negligent and reached the level of deliberate indifference to Bernard's serious medical condition.

65.     On the evening of April 17, 2019, Defendant Rayroux went to unit 168.

66.     At approximately 9:27 p.m., on April 17, 2019, Bernard was moved from unit 168 to Alpha Unit, cell # 207, in the general population, per Defendant Rayroux's request.

67.     ECDC records indicate that Defendant Rayroux authorized moving Bernard, and Officer E. Martinez instructed ECDC officers to move Bernard to Alpha Unit, cell # 207, in the general population, in order to clear unit 168 for another detainee who had swallowed contraband and was being returned from the hospital's emergency department.

68.     With knowledge Bernard was ill and was to be monitored for withdrawal, Defendant Rayroux placed him in a situation in which his condition could not be properly monitored.

69.     Despite Defendant Rayroux's knowledge of Bernard's symptoms and serious medical condition, he failed to perform a physical exam on him; palpitate his abdomen; consult with a physician, nurse practitioner, or other qualified medical provider, or supervisor; refer him for examination by physician, nurse practitioner, or other qualified provider; ensure that he had proper treatment or that his condition was being properly monitored; or arrange for him to be transferred to a medical facility for proper examination and treatment.

70.     Defendants Rayroux violated ECDC's policies and procedures and his professional standards of care.

71.     Defendant Rayroux's actions and omissions were more than negligent and reached the level of  deliberate indifference to Bernard's serious medical condition.

72.     On April 18, 2019, Judy Carter, a psychological examiner, conducted a Behavioral Health Initial Evaluation of Bernard.

73.     Ms. Carter recorded Bernard's strength as "cooperative."

74.     Ms. Carter recorded that "Bernard is still in withdrawals from drug use."

75.     Ms. Carter recorded that Bernard "is weak and reports not being able to keep food down."

76.     Ms. Carter recorded "Bernard is struggling with withdrawals and asks if he can have soup. Will consult with nursing."

77.     Ms. Carter recorded as a "Plan," "Consult with: NURSING."

78.     Upon information and belief, Bernard's condition that observed and recorded by Ms. Carter was relayed to Defendants Rayroux and Marin.

79.     On April 18, 2019, Defendant Rayroux ordered a clear liquid therapeutic diet to start with dinner on April 18, 2019, for twenty-four hours, ending on April 19, 2019.

80.     On April 18, 2019, Defendant Marin ordered a clear liquid therapeutic diet to start on April 19, 2019, and ending in twenty-four hours.

81.     On the morning of April 19, 2019, Bernard sought the assistance of Defendant Bryant while she was performing morning med pass duties.

82.     Bernard complained to Defendant Bryant of fentanyl withdrawal, nausea, and vomiting.

83.     Defendant Bryant stated on May 6, 2019, that on April 19, 2019, during the morning med pass, Bernard's pulse was elevated.

84.     On April 19, 2019, when Bernard asked Defendant Bryant for assistance during the morning med pass, she only administered medication previously prescribed for symptom treatment, and instructed him to keep hydrated by taking sips of water often, to let the guard know if there was no improvement or worsening, and to let the night nurse monitor him.

85.     Despite Bernard's specific request for medical assistance and Defendant Bryant's knowledge of his symptoms and condition, Defendant Bryant failed to perform a physical exam on him; palpitate his abdomen; consult with a physician or supervisor; refer him for examination by physician, nurse practitioner, or other qualified provider; ensure that Bernard had proper treatment or that his condition was being properly monitored.

86.     Defendant Bryant violated ECDC's policies and procedures and her professional standard of care.

87.     Defendants Bryant's actions and omissions were more than negligent and reached the level of deliberate indifference.

88.     Bernard was not monitored by any medical staff that night or the next morning.

89.     Bernard was not provided with appropriate medical treatment.

90.     On April 19, 2019, at approximately 11:40 a.m., Defendant Maxwell retrieved Bernard from his cell for video arraignments and assisted with video arraignments while Bernard was vomiting.

91.     Upon information and belief, Defendant Maxwell knew that Bernard was seriously ill and vomiting, but failed to seek appropriate medical assistance for him or to ensure his condition was being properly monitored.

92.     Defendant Maxwell violated ECDC's policies and procedures.

93.     Defendant Maxwell's actions and omissions were more than negligent and reached

the level of deliberate indifference.

94.     Defendant Massingill reported that on April 19, 2019, at approximately 12:50 p.m., Bernard was vomiting during his video arraignment, that Bernard told him he was not feeling well, and that Bernard told him he was coming off of methamphetamine and fentanyl.

95.     Bernard stayed outside of the video arraignment room so he could be near a trash can in case he needed to vomit and eventually asked to be returned to his cell because he was not feeling well.

96.     Bernard was returned for arraignment and following arraignment asked to be returned to his cell because he was not feeling well.

97.     Defendant Massingill knew that Bernard was seriously ill and failed to seek appropriate medical assistance for him.

98.     Defendant Massingill violated ECDC's policies and procedures.

99.     Defendant Massingill's actions and omissions were more than negligent and reached the level of deliberate indifference.

100.     Defendant Sullivan reported that on April 19, 2019, at 5:45 p.m., it had been communicated to him during shift briefing that Bernard was in Alpha cell 207 and that Bernard was ill and was detoxing from fentanyl.

101.     On April 19, 2019, at approximately 6:30 p.m., Defendant Sullivan spoke with Bernard in his cell and Bernard told him that he wanted to see medical staff during med pass.

102.     Defendant Marin wrote in her "Nurses Notes" dated April 19, 2019, that "inmate refused my request to come down from his cell."

103.     Defendant Marin stated in her notes: "I was informed by Officer Sullivan that the inmate had refused saying he 'couldn't walk.' Officer informed me that the inmate had been

walking up and down the stairs all evening and had also been in the shower prior to Alpha lockdown for med pass. Inmate did continue his refusal to come down for med pass. Inmate did not give cause for concern at that time other that [sic] to accept his refusal and based on the statements of his activity prior, almost immediately to med pass. Instructed to notify if changes."

104.    Defendant Sullivan reported that Defendant Marin told him that she was not going to look at Bernard or talk to him because he was able to walk.

105.    Despite Bernard's specific requests for medical assistance and Defendant Marin's knowledge of his symptoms and condition, Defendant Marin refused to perform a physical exam on him; palpitate his abdomen; consult with a physician or supervisor; refer him for examination by physician, nurse practitioner, or other qualified provider; ensure that Bernard had proper treatment or that his condition was being properly monitored.

106.    Defendant Marin violated ECDC's policies and procedures and her professional standard of care.

107.    Defendant Marin's actions and omissions were more than negligent and reached the level of deliberate indifference.

108.    Defendant Sullivan, while serving in a custodial role and being Bernard's only means to seek medical help, and with knowledge of Bernard's symptoms and serious medical condition, and with knowledge that Defendant Marin refused to provide medical assistance to Bernard, failed to report Bernard's serious condition and the lack of medical treatment to a supervisor or other party who could provide or obtain medical assistance, failed to seek transfer of Bernard to a medical facility for examination and treatment, and failed to monitor Bernard's condition or follow-up on his status.

109.    Defendant Sullivan violated ECDC's policies and procedures.

110.   Defendant Sullivan's actions and omissions were more than negligent and reached the level of deliberate indifference.

111.   On April 20, 2019, at 6:42 a.m., ECDC Officer Jeremy Solomon reported that Bernard refused breakfast.

112.   On April 20, 2019, at 8:24 a.m., ECDC Officer Vincent DeAngelis asked Bernard if he wanted medications and he replied that he did.

113.   When Officer DeAngelis returned with ECDC Nurse Sherri Kurimski, Bernard stumbled out of his cell and stated, "I can't stand, I'm going to fall, I'm going to fall."

114.   Bernard collapsed in front of his cell, hit his head, and suffered a laceration to his eyebrow area.

115.   At 8:30 a.m., Nurse Kurimski advised that Bernard needed to be taken to the hospital to attend to the laceration on Bernard's eyebrow.

116.   Nurse Kurimski left to fill out paperwork to transport Bernard to the emergency department of the hospital.

117.   At 8:40 a.m., Sgt. Anthony Ponce called for the Automated External Defibrillator.

118.   At 8:41 a.m., Bernard was observed to be lying on his right side on a mattress on the ground, and breathing heavily while moving his jaw side to side.

119.   Bernard vomited a red and black substance.

120.   At 8:42 a.m., Defendant Roger Maxwell went to the nurses' station with papers that Nurse Kurimski needed to complete to transport Bernard for emergency treatment.

121.   At 8:42 a.m., ECDC Cpl. Franco called the nurses' station to inform them that Bernard was not responsive.

122.   At 8:46 a.m., Nurse Kurimski commenced performing CPR on Bernard, and ECDC

officers alternated performing chest compressions.

123.    An Emergency Medical Services team arrived at 8:55 a.m., and took over resuscitation efforts.

124.    Bernard Martinez was pronounced dead at 9:14 a.m., in his cell at ECDC.

125.    From the time Bernard was booked on April 15 until his death on the morning of April 20, 2019, his blood pressure and pulse were taken and recorded four times, and his temperature was recorded once.

126.    Vital signs of blood pressure and pulse were recorded three times on a "Medication Administration Record" identified as "Charting For: 4/19" under a diagnosis: at booking on April 15, his blood pressure was recorded as 120/80, pulse 106; the morning of April 17, his blood pressure was recorded as 110/76, pulse 89; and the morning of April 19, his blood pressure was recorded as 120/80, pulse of 100.

127.    An ECDC Medical Department form titled "SBAR," believed to be an acronym for Situation, Background, Assessment, and Recommendation, dated April 17, 2019, and identifying Defendant Rentschler as the nurse and Defendant Bannister as the physician, indicated that Bernard's blood pressure was 120/80, pulse was 106, respirations were 16, temperature was 96.5, and oxygen saturation was 100.

128.    At no time was a physical exam performed on Bernard.

129.    At no time did any provider palpitate Bernard's abdomen.

130.    At no time were differential diagnoses considered for the source or sources of Bernard's condition, or ruled out.

131.    The New Mexico Office of Medical Investigator determined the cause of Bernard's death to be sepsis due to peritonitis due to gastric perforation.

132.    The New Mexico Office of Medical Investigator reported that "there was evidence of peritonitis with pus in the abdominal cavity and 1.3 liters of cloudy peritoneal fluid."

133.    The New Mexico Office of Medical Investigator reported that bacterial cultures of Bernard's blood and the peritoneal fluid grew Streptococcus pneumoniae and Escherichia coli.

134.    Upon information and belief, Bernard Martinez suffered from sepsis due to peritonitis due to gastric perforation and died due to Defendants' failures to provide adequate medical care and due to failure to provide humane conditions of confinement.

135.    Multiple withdrawal symptoms and complications, including gastric and bowel complications are known risks of unaided and abrupt cessation of opiate use without drug substitution and step-down.

136.    Upon information and belief, Bernard Martinez suffered from withdrawal from opiates, had serious gastrointestinal complications, sepsis, and died due to Defendants' failure to follow its own policies and procedures and failure to timely obtain proper medical treatment for him.

137.    Defendants actually knew, or should have known, that untreated acute medical conditions can result in serious bodily injury or death.

138.    Defendants knew, or should have known, that drug withdrawal can result in serious bodily injury or death.

139.    The Eddy County Detention Center Policy and Procedure on Clinical Services states: "It is the policy of the Eddy County Detention Center to provide detainees with unimpeded access to a full range of health programs, commensurate with contemporary community standards."

140.    The Eddy County Detention Center Policy and Procedure on Clinical Services state:

"A continuum of health care services will be available to detainees while in custody."

141.    The Eddy County Detention Center Policy and Procedure on Clinical Services states that "[m]edical orders for a detainee by a physician will be followed by facility staff, consistent with facility security."

142.    The Eddy County Detention Center Policy and Procedure on Clinical Services states that "[e]mergency care will be available for acute illness or unexpected health care needs that cannot be deferred until the next scheduled sick call."

143.    The Eddy County Detention Center Policy and Procedure on Continuity of Care states: "Continuity of care begins at the time a detainee is received by obtaining a thorough medical history with pertinent follow-up reports from past health records either within or outside of the system.

144.    The Eddy County Detention Center Policy and Procedure on Continuity of Care states: "All tests, therapies, medications, appointments and specialty consultations are caried out as ordered, and in a timely manner."

145.    The Eddy County Detention Center Policy and Procedure on Continuity of Care states: "All incarcerated individuals shall have a receiving screening performed. This screening will include proper documentation of any reported medical problems or medications currently being used, evaluations of any new medical complaints, and plan for continuity of care."

146.    The Eddy County Detention Center Policy and Procedure on Referrals states: "All detainees will receive appropriate care for their medical, mental health, and dental problems."

147.    The Eddy County Detention Center Policy and Procedure on Referrals states: "Those detainees who require off-site specialty care or hospitalization in approved facilities will be promptly scheduled, transported safe[l]y, and in a timely manner, per community standards."

148.     The Eddy County Detention Center Policy and Procedure on Referrals states: "The Medical Director or designee in conjunction with the program administrator arranges the specialty consultations or admissions to the hospital."

149.     The Eddy County Detention Center Policy and Procedure on Transportation Detainee-Patient states: "The purpose of this directive is to ensure detainee access to care is maintained through timely movement to medical, mental, and dental health clinics."

150.     The Eddy County Detention Center Policy and Procedure on Transportation Detainee-Patient states: "It shall be the policy of the Eddy County Detention Center that transportation is provided safely and is a timely manner when the detainee has medical, dental or mental health care needs beyond the resources available in the facility as determined by the responsible physician."

151.     The Eddy County Detention Center Policy and Procedure on Special Needs Detainees states: "Detainee admitted under the influence of alcohol or drugs are kept separated from the general population and kept under close supervision for a reasonable amount of time."

152.     The Eddy County Detention Center Policy and Procedure on Special Needs Detainees states: "The status of a special needs patient (detainee) shall be reviewed on a continuous basis by the physician or designee."

153.     The Eddy County Detention Center Policy and Procedure on Infirmary Care states: "There is no Infirmary at the Eddy County Detention Center, if there is a need of special medical observation of a detainee that cannot be carried out by the ECDC medical staff, the detainee will be sent to the local hospital per physician's orders.

154.     The Eddy County Detention Center Policy and Procedure on Infirmary Care states: "When a detainee has a medical situation that requires segregation and/or observation on a 24 hour

basis, the medical department at ECDC is not equipped or staffed for this; therefore, they are unable to carry out this requirement. If this situation occurs it will require the detainee to be admitted to the Carlsbad Medical Center (local hospital) until such time as the segregation and/or observation is no longer necessary."

155.    The Eddy County Detention Center Policy and Procedure on Detoxification states that qualified health care professionals will provide care to newly incarcerated individuals that enter the system with alcohol or drug withdrawal.

156.    The Eddy County Detention Center Policy and Procedure on Detoxification requires qualified health care professionals to keep detainees at risk for progression to more severe levels of withdrawal "under constant observation," and when severe withdrawal symptoms are observed, a physician is notified immediately.

157.    The Eddy County Detention Center Policy and Procedures on Detoxification requires that detoxification from opiates be "conducted under medical supervision when performed at the facility or is conducted in a hospital or community detoxification center."

158.    The Eddy County Detention Center Policy and Procedure on Detoxification requires specific guidelines to be followed for the treatment and observation of individuals manifesting mild or moderate symptoms of withdrawal from drugs.

159.    The Eddy County Detention Center Policy and Procedure on Detoxification states: "Detainees experiencing severe, life-threatening . . . withdrawals are transferred under appropriate security conditions to a facility where specialized care is available."

160.    The Eddy County Detention Center Policy and Procedure on Detoxification requires ambulatory detoxifying detainees "be placed in an area where close observation is available."

161.    The Eddy County Detention Center Policy and Procedure on Detoxification states: "During the receiving screening process if a detainee reports a substance abuse condition, the health care provider will initiate an alcohol/drug withdrawal flow sheet. During the first four days of his/her incarceration the detainee will be assessed daily for signs and symptoms of withdrawal. Should abnormal signs be identified, the physician is consulted promptly."

162.    The Eddy County Detention Center Policy and Procedure on Detoxification states: "Detainees experiencing severe life-threatening . . . withdrawal will be transferred immediately to a licensed acute care facility."

163.    The Eddy County Detention Center Policy and Procedure on Detoxification  states: "Those detainees processed into the detention center (booked) who are under the influence of alcohol or drugs shall be separated from the general population and kept under close supervision for a reasonable period of time."

164.    The Eddy County Detention Center Policy and Procedure on Detoxification states: "Communication and coordination is evident between medical, mental health, and classification regarding the care and treatment of these detainees."

165.    The Eddy County Detention Center Policy and Procedure on Detoxification states: "The Program Administrator or designee will determine when a detainee is to be released from medical isolation."

166.    The Eddy County Detention Center Policy and Procedure on Detoxification provides that Medical and detention staff is trained to recognize the signs and symptoms of drug withdrawal, and that "[d]etainees who report or are observed to be in acute physical withdrawal should be referred to the county physician for medical detoxification supervision."

167.    Upon information and belief, Defendants failed to abide by Eddy County Detention

Center Policies and Procedures in the detention and treatment of Bernard Martinez, and those failures resulted in the death of Bernard Martinez.

### COUNT I
### VIOLATION OF BERNARD MARTINEZ'S DUE PROCESS RIGHTS TO HUMANE CONDITIONS OF CONFINEMENT AND ADEQUATE MEDICAL CARE PROTECTED BY THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE II, SECTIONS 13 AND 18, OF THE CONSTITUTION OF THE STATE OF NEW MEXICO
### (All Defendants)

168. Plaintiff restates each of the preceding allegations as if fully stated herein.

169. Bernard Martinez had a right to humane conditions of confinement, including a right to reasonable medical care, that was protected by the Fourteenth Amendment to the Constitution of the United States.

170. Bernard's constitutional right to humane conditions of confinement and adequate medical care was clearly established.

171. Bernard Martinez had the right to be free of cruel and unusual punishment as a pretrial detainee protected by Section 13, of Article II of the Constitution of the State of New Mexico.

172. Defendants violated Bernard Martinez's federal and state constitutional rights by repeatedly failing to provide him with reasonable and timely medical treatment in light of serious and obvious medical needs.

173. Defendants were deliberately indifferent to Bernard Martinez's serious and obvious medical condition and needs.

174. Defendants' deliberate indifference to Bernard Martinez's serious and obvious medical condition and needs violated his right to humane conditions of confinement and adequate medical care protected by the Fourteenth Amendment to the Constitution of the United States.

175.    The conditions of confinement to which Bernard Martinez was subjected amounted to punishment of a pre-trial detainee in violation of the Fourteenth Amendment to the Constitution of the United States.

176.    Defendants violated Bernard Martinez's right to substantive and procedural due process. Defendants each had a duty to refrain from acting with deliberate indifference to Bernard's serious and obvious medical condition and needs and to provide humane conditions of confinement. They intentionally shirked their duties and intentionally endangered him when they were aware of Bernard's serious medical needs and risk of serious injury and death, but they consciously refused to act until he collapsed and his death was imminent.

177.    Defendants' acts and omissions also violated Bernard's rights under Sections 13 and 18, of Article II of the Constitution of the State of New Mexico.

178.    As a proximate and foreseeable result of Defendants' deliberate indifference to Bernard's serious, obvious medical condition, and the conditions of confinement to which he was subjected, in violation of his rights protected by the Fourteenth Amendment to the Constitution of the United States, and his rights protected by the Constitution of the State of New Mexico, Bernard suffered death, physical injuries, exacerbation of his medical condition, loss of chance, pain and suffering, and emotional distress.

### COUNT II
### CUSTOM AND POLICY OF VIOLATING CONSTITUTIONAL RIGHTS
### (Defendants Eddy County, Sheriff Cage, and Warden Massingill)

179.    Plaintiff restates each of the preceding allegations as if fully stated herein.

180.    Defendants Eddy County, Sheriff Cage, and Warden Massingill were responsible for operating ECDC.

181.    Defendants responsible for operating ECDC delegated the responsibilities of

making and implementing policies for, and managing operations at ECDC to Defendant Massingill.

182.   Pursuant to state law, jail administrators acting in their official capacity are regarded as the final policy makers of their respective institutions.

183.   Defendant Massingill was the final policy maker responsible for the hiring, training, and supervision of ECDC employees.

184.   Defendant Massingill's customs, policies, and practices were those of Defendants Eddy County and Sheriff Cage.

185.   Defendant Massingill practiced and operated under customs, policies, and practices of acting with deliberate indifference to the medical care and needs of inmates at ECDC, including Bernard Martinez.

186.   Defendant Massingill's customs, policies, and practices created an environment where staff were deliberately indifferent to inmates with conditions like those of Bernard Martinez, and to his condition.

187.   Defendant Massingill practiced and operated under customs, policies, and practices of permitting unconstitutional restraint of inmates.

188.   The customs, policies, and practices of Defendant Massingill created a climate within ECDC where staff considered the use of unconstitutional indifference toward the medical needs of detainees.

189.   Defendant Massingill's customs, policies, and practices created conditions under which people detained at ECDC, including Bernard Martinez, were deprived of reasonable medical care.

190.   While Bernard Martinez was detained at ECDC, detention officers and medical

staff followed the customs, policies, and practices put in place by Defendant Massingill.

191.   Defendant Massingill's customs, policies, and practices resulted in the violation of Bernard Martinez's clearly established constitutional right to humane conditions of confinement and adequate medical care.

192.   Defendant Massingill's customs, policies, and practices resulted in the violation of Bernard Martinez's clearly established procedural and substantive due process rights protected by the Fourteenth Amendment to the Constitution of the United States.

193.   As a proximate and foreseeable result of Defendants' customs, policies, and practices, and their hiring, supervision, and training decisions that violated the Fourteenth Amendment to the Constitution of the United States, Bernard Martinez suffered physical injuries, creation or exacerbation of his medical condition, loss of chance, pain and suffering, emotional distress, and wrongful death.

## <u>COUNT III</u>
## STATE TORTS: NEGLIGENT PROVISION OF MEDICAL CARE AND NEGLIGENT OPERATION OF A MEDICAL FACILITY
### (Defendants Eddy County, Sheriff Cage, Warden Massingill, Bannister, Rayroux, Rentschler, Bryant, and Marin)

194.   Plaintiff restates each of the preceding allegations as if fully stated herein.

195.   Defendants Eddy County, Sheriff Cage, Warden Massengill, and ECDC medical providers named as Defendants herein negligently operated the ECDC medical facility.

196.   Plaintiff provided Defendants with timely and adequate notice of their claims pursuant to the State Tort Claims Act.

197.   Defendant Darla Bannister was contracted by Eddy County to provide medical and clinical services care to inmates at the ECDC, including Bernard Martinez.

198.   Defendant Darla Bannister is vicariously liable for the acts and omissions of her

employees or agents, and are directly liable for her own acts and omissions.

199.     Defendant Bryan Rayroux, R.N., was responsible for conducting the medical intake process of Bernard Martinez, providing medical care, authorizing housing decisions based on a detainee's medical condition, and following applicable ECDC policies during Bernard's detention resulting in his death. He knew or should have known Bernard suffered a serious medical condition and that his life was in jeopardy.

200.     Defendants Darla Bannister, ACNP; Emma Rentschler, R.N.; Rhonda Bryant, R.N.; and Sylvia Marin, R.N., were responsible for providing medical care for Bernard Martinez during his detention and for following applicable ECDC policies. They knew or should have known Bernard suffered a serious medical condition and that his life was in jeopardy.

201.     Defendants Bannister, Rayroux, Rentschler, Bryant, and Marin owed a duty of care to Bernard Martinez to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified medical and clinical professionals in their fields.

202.     Defendants Bannister, Rayroux, Rentschler, Bryant, and Marin failed to possess and apply the knowledge and use the skill and care ordinarily used by reasonably well-qualified health care providers in their fields.

203.     Defendants Darla Bannister acting directly, as well as through her employees, agents, apparent and/or ostensible agents, contractors, failed to possess and apply the knowledge and use the skill and care ordinarily used by reasonably well-qualified health care providers.

204.     Defendants Bannister, Rayroux, Rentschler, Bryant, and Marin owed a duty to follow policies, procedures, or protocols for inmates suffering from or at risk for drug withdrawal and for acute illness.

205.     Defendants Bannister, Rayroux, Rentschler, Bryant, and Marin failed to follow

policies, procedures, or protocols for inmates suffering from or at risk for drug withdrawal and for acute illness.

206.    Defendants Bannister, Rayroux, Rentschler, Bryant, and Marin failed to act reasonably under the circumstances and failed to provide the medical health care Bernard desperately needed.

207.    Defendants' negligent acts, inactions, or omissions include:

- failure to appreciate or recognize Bernard's signs, symptoms, and risks of acute illness and drug withdrawal;

- failure to follow policies, procedures, or protocols for inmates who are suffering from acute illness and drug withdrawal;

- failure to perform physical exam;

- failure to perform physical exam in light of symptoms of serious medical condition;

- failure to palpitate abdomen;

- failure to obtain vital signs;

- failure to obtain vital signs in light of symptoms of serious medical condition;

- failure to render aid to an inmate with whom Defendants were obligated to provide reasonable medical care, including emergency medical care;

- failure to appreciate or recognize Bernard's condition during the course of his detention at ECDC;

- failure to properly treat Bernard according to the applicable standards of care;

- failure to timely or properly respond to reports of Bernard's deteriorating condition;

- failure to properly respond to Bernard's violent vomiting, inability to eat or keep food down, weakness, and exhibition of other symptoms indicating he was at risk for serious injury or death;

- failure to properly and timely assess and treat Bernard's condition;

- failure to properly and timely diagnose or rule out differential diagnoses of Bernard's condition;

- failure to oversee medical care for Bernard;

- failure to properly monitor Bernard's condition;

- failure to timely or properly consult with other health care professionals regarding Bernard's condition;

- failure to obtain or consider medical records;

- failure to document Bernard's medical condition;

- failure to act reasonably under the circumstances;

- failure to ensure Bernard received reasonably proper medical care under the circumstances;

- failure to ensure Bernard was not harmed as a result of Defendants' actions and inactions;

- willfully, recklessly, wantonly, or intentionally ignoring or refusing to respond to the need for medical assistance;

- willfully, recklessly, wantonly, or intentionally ignoring signs and symptoms that Bernard's life and health were in grave danger, including his condition as described herein, and taking no appropriate measures that addressed that danger;

208.    Defendants' actions and inactions constitute breaches of their requisite duties of

care owed to Bernard Martinez.

209.    Defendants' actions and inaction constitute negligent provision of medical care.

210.    Defendants' actions and inaction constitute negligence in operating a medical facility.

211.    Defendants' breaches of their duties of care caused or contributed to Bernard's pain and suffering, loss of chance, wrongful death, and other damages.

212.    As a direct and proximate cause of Defendants' negligent acts and omissions, Bernard Martinez died.

213.    Defendants' breaches of their duties of care were willful, reckless, wanton, or intentional.

214.    Defendants Bannister, Rayroux, Rentschler, Bryant, and Marin are individually liable for compensatory damages and punitive damages for medical negligence and negligent operation of a medical facility.

215.    Defendant Darla Bannister is individually liable and vicariously liable for the acts, inactions, or omissions of her employees and agents for compensatory damages and punitive damages for medical negligence and negligent operation of a medical facility.

216.    Defendants Eddy County, Sheriff Cage, and Warden Massengill are individually liable for compensatory damages and punitive damages for negligent operation of a medical facility.

**<u>COUNT IV</u>**
**NEGLIGENT POLICIES, TRAINING, OR SUPERVISION**
**(Defendant Darla Bannister)**

217.    Plaintiff restates each of the preceding allegations as if fully stated herein.

218.    Defendant owed the duty to properly screen, hire, train, monitor, supervise, and/or

discipline her employees and agents, and to ensure they were qualified, competent, and suitable to perform their respective jobs or roles.

219.    Defendant owed the duty to adopt and enforce appropriate policies, procedures, and protocols.

220.    Defendant breached their duties and were negligent in the screening, hiring, training, supervision, monitoring, and/or disciplining of her employees and agents.

221.    Defendant breached her duties and were negligent in failing to  adopt and enforce appropriate policies, procedures, and protocols.

222.    Defendant's conduct constitutes negligence, recklessness, willful or wanton negligence, or intentional acts.

223.    Defendant's negligence, recklessness, willful or wanton negligence, or intentional acts caused or contributed to Bernard's wrongful death, loss of chance, pain and suffering, and other damages.

224.    Defendant is individually liable and vicariously liable for the acts, inactions, or omissions of her employees and agents for compensatory damages and punitive damages for negligent policies, training, or supervision.

## COUNT V
## ORDINARY NEGLIGENCE UNDER NEW MEXICO TORT LAW
### (Defendant Darla Bannister)

225.    Plaintiff restates each of the preceding allegations as if fully stated herein.

226.    Defendant Bannister had a duty of ordinary care to reasonably ensure Bernard Martinez's safety, care, and protection, to communicate foreseeable risks to his safety, care, and protection to appropriate individuals under the circumstances, and to take all reasonable measures under the circumstances to ensure his safety, care, and protection from foreseeable risks during his

incarceration at ECDC.

227.    Defendant breached her duties of care.

228.    Defendant's acts, inactions, and omissions include, but are not limited to:

• failure to monitor Bernard Martinez's symptoms and condition;

• failure to communicate Bernard Martinez's symptoms and condition to the appropriate persons or entities;

• failure to document detoxification protocols;

• failure to document Bernard's condition;

• failure to obtain or consult medical records;

• failure to create medical records

• failure to timely and properly seek assistance for Bernard Martinez's condition;

• failure to timely obtain a referral for Bernard Martinez or arrange for his proper care;

• failure to timely arrange to transfer, or transfer Bernard to a hospital or other appropriate facility for his care and treatment;

229.    Defendant breached the ordinary standard of care.

230.    Defendant's acts and omissions in breach of ordinary standards of care constitute negligence, recklessness, willful or wanton negligence, or intentional acts.

231.    Defendant's negligence, recklessness, willful or wanton negligence, or intentional acts caused or contributed to Bernard's wrongful death, pain and suffering and other damages.

232.    Defendant is liable for her acts, inactions, or omissions, and for compensatory damages and punitive damages caused by her ordinary negligence.

## COUNT VI
## BREACH OF CONTRACT
### (Defendant Darla Bannister)

233.    Bernard Martinez was a third-party beneficiary of contracts and subcontracts between Defendant Darla Bannister and Eddy County.

234.    Defendant, through her contracts and subcontracts, intended to benefit inmates like Bernard Martinez and Bernard Martinez himself.

235.    Defendant breached her duties under her contracts and subcontracts by failing to perform their contractual obligations when that performance was called for and was not otherwise excused.

236.    Defendant's breaches were reckless, willful or wanton, or intentional.

237.    Defendant's breaches under her contracts caused or contributed to Bernard's wrongful death, pain and suffering, and other damages.

238.    Defendant is individually liable and vicariously liable for the acts, inactions, or omissions of her employees and agents for compensatory damages and punitive damages for breach of contract.

## JURY DEMAND

239.    Plaintiff restates each of the preceding allegations as if fully stated herein.

240.    Plaintiff hereby demands a trial by jury on all counts.

WHEREFORE, Plaintiff requests judgment as follows:

1.    All damages that are fair and just pursuant to the laws of the United States and in an amount supported by the evidence presented at trial;

2.    Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for emotional harm;

3.      Punitive damages in an as undetermined amount severally against the individual named Defendants;

4.      Reasonable costs and attorney fees incurred in bringing this action; and for

5.      Such other and further relief as the Court deems just and proper.

**THE SPENCE LAW FIRM NM, LLC**

*/s/ Alisa C. Lauer*_____
G. Bryan Ulmer
Dennis K. Wallin
Alisa C. Lauer
1600 Mountain Rd. NW
Albuquerque, NM  87104
505.832.6363
ulmer@spencelawyers.com
wallin@spencelawyers.com
lauer@spencelawyers.com